UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LATRICIA BLACK,<br><br>  Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Commissioner of Social Security,<br><br>  Defendant. | No. 3:16-cv-1727 (MPS) |

## MEMORANDUM AND ORDER

Latricia Black filed this appeal, seeking a reversal of the Commissioner of Social Security's final decision that Black is not disabled, not entitled to disability insurance benefits (DIB), and not eligible for supplemental security income payments under Title XVI of the Social Security Act. For the reasons that follow, I DENY the plaintiff's motion to reverse the decision of the Commissioner and GRANT the Commissioner's motion to affirm.

**I.  Background**

  A. Factual Background

The parties stipulate to the following facts. Latricia Black was born on May 27, 1974. (ECF No. 28 at ¶ 1.) She was 39 on her amended alleged onset date. (*Id.* at ¶ 10.) Her date last insured is June 30, 2014, when she was 40 years old. (*Id.* at ¶¶ 11–12.) She has a ninth-grade education. (*Id.* at ¶ 13.) The parties further stipulate as follows:

  *1.  Plaintiff's Testimony*

Black appeared at an administrative hearing on June 15, 2015 and testified to the following facts. (ECF No. 28 at 2.) She is able to read. (*Id.* at ¶ 15.) She has not driven since she was 28, because her leg cramps, but she is able to get around using medical cabs, My Ride (a transportation

1

service for the elderly and disabled), and the public bus, which she can manage because the step to the bus can be lowered to street level. (*Id.* at ¶¶ 17–18.) Black currently cares for her two-year-old child, watches TV, reads, takes care of household chores, helps her other children get ready for school, and cooks—all with help from her nephew and husband. (*Id.* at ¶ 19.) Although Black previously performed some fast food work as a cashier, the ALJ determined that that work experience did not constitute past relevant work. (*Id.* at ¶ 14.) Black stated that she lost her last job, at Little Caesar's, in April 2012, because she was experiencing pain in her hip. (*Id.* at ¶ 23.) She stated that she also lost a previous job—assembly in a warehouse—because she was absent from work due to hip pain. (*Id.* at ¶ 24.) Black testified: "I kept trying to work, but then my bosses had to let me go because I was missing too many days . . . because of my hip problem." (*Id.* at ¶ 25 (citing R. at 41–44).)

Black also testified about her medical history. She stated that she has had three total left hip surgeries: (1) at age 14; (2) at age 18; and (3) at age 39. (ECF No. 28 at ¶ 20.)[1] For some time before her third total left hip surgery, she used a crutch to ambulate. (*Id.* at ¶ 21.) She also testified that she used a walker for two to three months after this third surgery. (*Id.* at ¶ 22.) She stated that she now uses a cane. (*Id.*)

2. *Medical History Evidence*

The record also contains evidence regarding Black's medical history. Black, who had been diagnosed with Marfan syndrome, developed a painful acetabula protrusion (intrapelvic displacement of a socket making up part of the hip joint) bilaterally, the left worse than the right. (ECF No. 28 at ¶ 26.) By April 1988, she had been unable to bear weight on it for over a year, and

---

[1] At age 14, Black actually had two surgeries that were several days apart: the first was a total left hip replacement; the second one was a repair for a displacement, which had occurred while she was recovering from the first surgery. (ECF No. 28 at ¶ 20.)

she elected to undergo a total left hip replacement. She had the surgery on April 4, 1988. (*Id.* at ¶¶ 26–27.) After approximately a week, her leg dropped off the side of the bed, resulting in a dislocation of the new prosthesis; so on April 12, 1988, Black underwent a second left hip surgery to repair the dislocation. (*Id.* at ¶¶ 28–29.) Two years later, Black experienced bone softening around the screws used to implant the prosthesis, which loosened the hardware; this led her to undergo a second total left hip replacement surgery. (*Id.* at ¶¶ 30–31.)

Black then did well until July 2012. (ECF No. 28 at ¶ 32.) At that time, she presented to an orthopaedist and complained of pain in her hip. (*Id.*) She told the orthopaedist, Erik J. Carlson, that she was working at Little Caesars but that she was having some difficulty standing and walking for long periods. (*Id.*) Dr. Carlson noted that she walked with a Trendelenburg gait (i.e., an abnormal gait), so he referred her to physical therapy and recommended an orthotic insert. (*Id.* at ¶ 33.) After that, Black started using a crutch to walk. (*Id.* at ¶ 34.) On July 15, 2013, Black presented to Nurse Colleen L. Linari at Columbus Internal Medicine with complaints of left leg pain. (ECF No. 28 at ¶ 35.) Black stated that her pain had started approximately a year earlier but that it had recently increased. (*Id.*) At that time, she wore a brace on her knee and used a crutch to walk. (*Id.*) Nurse Linari referred Black to physical therapy and a CT scan, and she prescribed Ibuprofen 800, Flexeril, and Baclofen. In November 2013, Black advised Dr. Shasta Henderson that she had started using a crutch for ambulation about two or three months earlier. (*Id.* at ¶ 36.) A CT scan in 2013 revealed that Black had bone particle disease and that her hip bone replacement was breaking. (*Id.* at ¶ 37.)

In connection with her application for disability benefits, on February 4, 2014, Black was examined by consultative neurosurgeon Martin P. Hasenfeld. (ECF No. 28 at ¶ 38.) She reported to Dr. Hasenfeld that she was undergoing a pre-surgical workup, hoping to undergo hip

3

replacement surgery at Yale Orthopedic. (*Id.*) Dr. Hasenfeld observed that Black walked with a crutch at that time and that she needed a new hip replacement—but that she currently had adequate mobilization with an auxiliary crutch. (*Id.*) He noted that Black was able to perform seated activities and "believe[d] she is at a sedentary level at this time." (*Id.* (quoting R. 406 et seq).)

On March 28, 2014, after it was established that Black retained sufficient bone stock, she underwent a third total left hip replacement surgery. (ECF No. 28 at ¶ 39.) On April 1, 2014, she was transferred to Arden House for short-term rehabilitation. (*Id.* at ¶ 40.) She stated that she was feeling "pretty good" and that her pain was "not too bad." (*Id.* (quoting R. at 544).) She received physical therapy and was stable during her stay. (*Id.*) On April 11, 2014, she was discharged. (*Id.*) At that time, she was "up and about" and using a walker. (*Id.* (quoting R. at 546).)

In May 2014, at an appointment with Nurse Dresden, Black reported that she was not in a great deal of pain, except for when she performed her physical therapy exercises. (ECF No. 28 at ¶ 41.) Nurse Dresden prescribed Oxycodone for use after physical therapy sessions to address that pain. (*Id.*)

On June 2, 2014, state agency medical consultant, Dr. Firooz Golkar, reviewed Black's record. (ECF No. 28 at ¶ 46.) He opined that, in March 2014, prior to her surgery she could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty. (*Id.*) He further opined that before Black's surgery she was able to stand and walk for three hours, and sit for six hours, in an eight-hour day but that after her surgery she was able to stand and walk for six hours in an eight-hour day. (*Id.*)

On June 6, 2014, Black stated to Nurse Dresden that she was still free of pain normally, except for after her physical therapy appointments. (*Id.* at ¶ 42.) At that appointment, she was wearing a brace on her left hip and leg: she explained that it helped keep her hip in place while she

4

walked. (*Id.*) She reported that her mobility was improving. (*Id.*) Nurse Dresden prescribed Tramadol, Flexeril, and oxycodone for use after physical therapy sessions. (*Id.*)

In December 2014, Nurse Damodharan noted that Black had recently seen her orthopaedist, whose examination was unremarkable. (ECF No. 28 at ¶ 43.) Nurse Damodharan noted that the orthopaedist found no pain with a passive range of motion and no tenderness in the left hip. (*Id.*)

The other significant medical factors present in Black's records include: (1) her left leg is about an inch shorter than her right leg (ECF No. 28 at ¶ 44); (2) she is positive for a carrier of the sickle cell anemia trait (*id.* at ¶ 45); and (3) she has a right acetabula protrusion. (*Id.*)

B. Procedural History

On October 2, 2013, Black filed an application for disability insurance benefits, claiming to be disabled as of October 1, 1989. (ECF No. 28 at ¶ 1.) She also filed an application for Supplemental Security Income benefits. (*Id.* at ¶ 2.) The onset date was amended to July 17, 2012, the date on which Black presented to an orthopaedist complaining of new complications from her two prior left hip replacement surgeries. (*Id.* at ¶ 3.) Her Notice of Initial Denial was issued on March 12, 2014. (*Id.* at ¶ 4.) She then timely filed successive requests for reconsideration and hearing, but, on July 10, 2015, an ALJ denied her claim. (*Id.* at ¶ 5.) The ALJ found that Black had the residual functional capacity to perform light work, although with certain limitations. (*Id.* at ¶ 47.) Black filed a timely Request for Review on August 25, 2015. (*Id.* at ¶ 7.) On August 24, 2016, the decision of the Appeals Counsel made final the Commissioner's decision. (*Id.* at ¶ 8.)

Black filed this appeal on October 17, 2016, seeking to reverse the decision of the Commissioner. (ECF No. 1.) Black filed her motion to reverse or remand on March 17, 2017, (ECF No. 14) and the Commissioner's motion to affirm was filed on August 30, 2017. (ECF No. 24.)

## II. Legal Standard

This Court's review of the ALJ's decision is limited. The decision "may be set aside only due to legal error or if it is not supported by substantial evidence." *Crossman v. Astrue*, 783 F. Supp. 2d 300, 302–03 (D. Conn. 2010) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is less than a preponderance of the evidence, but "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is that amount of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* "Thus, as a general matter, the reviewing court is limited to a fairly deferential standard." *Crossman*, 783 F. Supp. 3d at 303 (internal quotation marks omitted) (quoting *Gonzalez v. Comm'r*, 360 F. App'x 240, 242 (2d Cir. 2010) (summary order)).

## III. Discussion

The Social Security Administration uses a five-step procedure for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit interprets that procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider [her] disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity [RFC] to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal alterations and citation omitted).

Black argues that the ALJ's RFC decision was not supported by substantial evidence and that the ALJ erred by relying solely on the "Grids" framework, under 20 C.F.R. Supt P, App II. For the reasons stated below, I disagree.

A. RFC Determination

In step four of the above analysis, the ALJ determined that Black was capable of "light work," as defined in 20 C.F.R. §§404.1567(b), 416.967(b), with several limitations. The ALJ determined that Black: (1) had no limitations on her ability to sit; (2) was limited to three hours of standing and walking; (3) was limited to carrying 20 pounds; (4) could not climb ladders, ropes, or scaffolds; (5) only occasionally could climb ramps and stairs or stoop, kneel, crouch, or crawl; (6) was limited to avoiding concentrated exposures to temperature extremes; and (7) could not have any exposure to heights or hazardous machinery. (R. 15.) Light work is defined as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal or walking or standing or when it involves sitting more of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do *substantially all* of these activities." *Id.* (emphasis added). And, "[i]f someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* The claimant in a Social Security Proceeding has the burden of demonstrating functional limitations that preclude performance of work activities. *See* 20 C.F.R. §§ 404.1512(c) ("If we ask you, you must inform us about . . . any other factors showing how your impairment(s) affects your ability to work."); 20 C.F.R. §§404.1545(a)(3) ("In general you are responsible for providing the evidence we will use to make a finding about your residual functional capacity."); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) ("[T]here is only a limited burden shift to the Commissioner at step five. . . . [T]he Commissioner need only show that there is work

7

in the national economy that the claimant can do; [the Commissioner] need not provide additional evidence of the claimant's residual functional capacity.").

Substantial evidence supported the ALJ's determination that Black is capable of light work. Black's testimony regarding her daily activities supported a conclusion that she could perform "substantially all" of the activities required for "light work," under the definition in 20 C.F.R. § 404.1567(b). She testified that she "spends her days taking care of her two year old, watching TV, reading, doing chores and cooking," with the "help of her grown nephew and husband." (ECF No. 28 at ¶ 19.) She stated that she "gets her young children ready for school in the morning, and then watches television or sits on her porch," at least "for a while." (*Id.*) She also stated that she is able to take the public bus for transportation, and she arrived at the hearing before the ALJ by bus. (*Id.* at ¶ 18, R. 35.) State agency medical consultant Dr. Firooz Golkar's opinion further supported the conclusion that Black is capable of light work: Dr. Golkar stated, after reviewing the record, that Black could lift and carry up to ten pounds and carry up to twenty pounds and that, following her surgery, Black could sit, stand, or walk for six hours in an eight-hour day. (ECF No. 28 at ¶ 46.) This opinion was consistent with Black's statements to multiple healthcare providers, indicating that, after her surgery, she was only in pain after physical therapy sessions and with her testimony about her daily activities. (*See id.* at ¶¶ 41–42.) Together, Black's testimony and Dr. Golkar's opinion are evidence that "a reasonable mind might accept as adequate to support a conclusion" that Black was capable of light work. *Richardson*, 402 U.S. at 401.

Black argues that substantial evidence does not support the ALJ's decision that she can do light work because "[t]he evidence establishes that [Black] has been reliant on a variety of assistive devices, at least since 2/4/2014" and because "[f]or some time after her recent hip surgery, she ambulated with a walker, and eventually graduated to a cane, which she continues to use." (ECF

8

No. 15 at 6–7.) Black states that this "reliance on an assistive device to walk would likely eliminate all jobs that equate to 'light work.'" (*Id.* at 7.)

That argument fails, though, because the evidence in the record does not establish that Black's use of a cane was medically necessary. "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9P (S.S.A. July 2, 1996). Black did introduce evidence that she used a cane or a crutch prior to her surgery and that she used a walker for several months after her surgery. (ECF No. 28 at ¶¶ 21–22.) She also stated in her testimony that she currently uses a cane to walk. (*Id.* at ¶ 22.) And there is evidence in the record that she wore a brace on her left hip and leg "to keep her hip in place while she walked." (*Id.* at ¶ 42.) But there was no evidence in the record about the current, post-surgery medical necessity of an assistive device or about when and for what purpose Black uses it. Further, treatment records post-dating the surgery make no mention of a cane, R. 581–606, and Dr. Golkar noted on June 2, 2014, that there was no medical indication for a hand-held assistive device. (R. 96). Black bears the burden of proof at this stage, so, without evidence to support the medical necessity of an assistive device, substantial evidence supported the ALJ's decision that Black was capable of light work.

B. Step Five Finding

Black also argues that the ALJ erred by relying solely on the Grids—without testimony from a vocational expert—to determine that there are jobs that exist in significant numbers in the national economy that Black can perform. "Application of the grid guidelines and the necessity for expert testimony [regarding the effect of nonexertional limitations] must be determined on a

9

case-by-case basis. If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). But, "where the claimant's work capacity is significantly diminished beyond that caused by [her] exertional impairment the application of the grids is inappropriate. By the use of the phrase 'significantly diminish' we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Id.* at 605–06. The Social Security Administration's regulations also state that the ALJ may rely solely on the grids "where it is clear that the additional [nonexertional] limitations have very little effect on the exertional occupational base." SSR 83-14 (S.S.A. Jan. 1, 1983).

Black argues that the combination of limitations found by the ALJ, namely, no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional stooping, kneeling, crouching, and crawling, and no concentrated exposure to temperature extremes, heights, or hazardous machinery, required the ALJ to rely on the testimony of a vocational expert at Step Five. This argument is unpersuasive because the ALJ's determination that Black's nonexertional limitations had little or no effect on the occupation base of unskilled light work is supported by substantial evidence, as applied to SSA regulations. SSR 83-14 lists nonexertional limitations or restrictions that have very little or no effect on the light work occupational base. These include: "the inability to ascend or descend scaffolding, poles, and ropes"; the "inability to craw on hands and knees"; and the "inability to use the finger tips to sense the temperature or texture of an object." SSR 83-14 (S.S.A. Jan. 1, 1983). Further, "[e]nvironmental restrictions . . . would also not significantly affect the potential unskilled light occupational base," and "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to

10

crouch and would need to stoop only occasionally. . . ." *Id.* Because Black's nonexertional limitations closely resembled limitations that do not affect the available occupational base, the ALJ did not err in relying solely on the Grids framework, rather than consulting a vocational expert.

Black also argues that solely consulting the Grids was improper because she "has suffered from repeated hip problems since childhood, necessitating 3 total replacements of her left hip, starting at age 14. . . . She also had a good deal of absenteeism, which she ascribed to her hip impairment. This raises the issue of how such absenteeism would erode even sedentary employment[.]" (ECF No. 15 at 8.) Absenteeism can affect a claimant's RFC determination. *See Beck v. Colvin*, No. 6:12-cv-06495 (MAT), 2013 WL 5533571, at *4 (W.D.N.Y. Oct. 7, 2013) (citing *Chiapa v. Secretary of Dept. of Health, Educ., and Welfare*, 497 F. Supp. 356, 360–61 (S.D.N.Y. 1980)); *see also Quatrone v. Colvin*, No. 3:15-cv-848 (WIG), 2017 WL 684441, at *4 (D. Conn. Feb. 21, 2017). However, absenteeism that would affect an RFC determination would need to stem directly from the claimant's current medical condition. The evidence in the record regarding absenteeism all relates to Black's condition before her March 2014 surgery. She testified that she lost her last job at Little Caesar's in April 2012, because of "pain and 'popping' in her hip." (ECF No. 28 at ¶ 23.) She also testified that she lost a job prior to the Little Caesar's job because of absenteeism. (*Id.* at ¶ 24.) But there is evidence in the record that her pain substantially decreased and that her mobility increased following her surgery in 2014. (*Id.* at ¶¶ 41–43.) Therefore—without any evidence regarding whether Black's current medical condition would cause her to be absent from a job—the ALJ's determination was based on substantial evidence, and no vocational expert testimony was necessary.

## IV. Conclusion

As stated above, because the ALJ's decision was supported by substantial evidence, I GRANT the Commissioner's motion to affirm. I DENY Black's motion to reverse.

IT IS SO ORDERED.

  /s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
               December 19, 2017